ASSOCIATES IN ADOLESCENT PSYCHIATRY, S.C., Marvin J. Schwarz and Joanne G. Schwarz, Trustees of the Defined Benefit and Defined Contribution Pension Plans and Trusts of Associates in Adolescent Psychiatry, S.C. and All Beneficiaries and Participants Thereunder, Plaintiffs,

v.

HOME LIFE INSURANCE COMPANY OF NEW YORK, a New York corporation, individually and d/b/a Qualified Pension/Profit Sharing Consultants, Inc.; Hospital Trust National Bank, a National Banking Association, Canapary Financial Corp., a corporation; Robert Canapary, individually and d/b/a Qualified Pension/Profit Sharing Consultants, Inc.; Ronald Aure, individually and d/b/a Qualified Pension/Profit Sharing Consultants, Inc.; Pension Actuaries, Inc., a corporation;

Eric Kranke; Levenfeld, Kanter, Baskes and Lippitz, a partnership; and Jerry H. Biederman, Defendants.

No. 82 C 4706.

United States District Court, N.D. Illinois, E.D.

Dec. 19, 1989.

Robert Radasevich, Neal, Gerber, Eisenberg & Lurie, Chicago, Ill., for Pension Actuaries, Inc.

James O. Nolan, Clausen, Miller, Gorman, Caffrey & Witous, P.C., Chicago, Ill., for Eric Kranke.

Eugene L. Mahoney, Mahoney & Zdeb, Ltd., Kenneth R. Gaines, Altheimer & Gray, Chicago, Ill., for Levenfeld, Kanter, Baskes, Lippitz and Biederman.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

### I. INTRODUCTION

This case concerns three of the most fecund sources of federal litigation: securities regulation, ERISA and RICO. The Court has determined that the securities and ERISA counts are stillborn; it orders further briefing of the RICO claims to see if they survive.

The plaintiffs are Associates in Adolescent Psychiatry, S.C. ("AAP"); AAP's owner, Marvin Schwarz, and his wife, Joanne, the trustees of AAP's defined benefit and defined contribution pension plans and trusts; and all of the participants in the plans and their beneficiaries. In 1977, AAP established a defined benefit plan to complement its previously established defined contribution plan. The plans then purchased insurance contracts from Home Life Insurance Company of New York to fund their benefit guarantees.

Complaining of various misrepresentations in the sale of these insurance products, plaintiffs brought a multi-count complaint against Home Life and several other defendants. The other defendants are two Home Life field underwriters, Robert Canapary and Ronald Aure, as well as Canapary's business, Canapary Financial Corp. ("Canapary defendants"); Rhode Island Hospital Trust National Bank ("HTNB"); Eric Kranke and his wholly owned company, Pension Actuaries, Inc. ("Kranke defendants"); and AAP's former lawyers, Levenfeld, Kanter, Baskes & Lippitz, and one of the firm's attorneys at the time, Jerry

Gregory Friedman, Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., for Associates in Adolescent Psychiatry.

Ernest Irons, Peterson, Ross, Schloerb & Seidel, Chicago, Ill., for Home Life Ins. Co. of New York.

Phillip L. Harris, Winston & Strawn, J. Scott Meyers, Williams & Montgomery, Ltd., Chicago, Ill., for Hospital Trust Nat. Bank.

Barbara A. McDonald, Lord, Bissell & Brook, Chicago, Ill., for Robert Canapary and Canapary Financial Corp.

Biederman ("Levenfeld defendants" or "group").

Plaintiffs allege that all of the defendants breached fiduciary duties and related-party rules under §§ 3(21)(A) and 3(14) of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1002(21)(A) and 1002(14). With respect to the defendants other than the Levenfeld group, plaintiffs allege violations of §§ 5, 12 and 17 of the Securities Act of 1933, 15 U.S.C. §§ 77e, 77l and 77q, as well § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and related Rule 10b–5, 12 C.F.R. 240.10b–5. Similarly, with respect to the defendants other than the Levenfeld group, plaintiffs allege various violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(a)-(d), as well as conspiracy to violate RICO. The Levenfeld defendants are named in a separate count of professional malpractice.

Each of the defendants has moved for summary judgment pursuant to Fed.R. Civ.P. 56. Plaintiffs have cross-moved for summary judgment, seeking a determination that one of the insurance contracts involved in the case is a security and that Home Life and HTNB are ERISA fiduciaries.

For the reasons explained below, the Court concludes that the insurance contracts are not securities under the 1933 and 1934 acts. It also concludes that none of the defendants is an ERISA fiduciary.

## II. FACTS

Under Rule 56, the Court may grant judgment as a matter of law provided that the material facts are not in genuine dispute. *See generally Wolf v. City of Fitchburgh*, 870 F.2d 1327, 1329–30 (7th Cir. 1989); *Spring v. Sheboygan Area School District*, 865 F.2d 883, 886 (7th Cir.1989). The rule requires that all reasonable inferences be drawn in favor of the nonmoving party; in the case of cross-motions for summary judgment, this means that the Court draws all reasonable inferences in favor of the party that is the nonmovant

with respect to the particular motion being considered. Therefore, the facts (which will be supplemented as necessary in the Court's analysis of the law) are as follows.

Marvin Schwarz practiced psychiatry in the Chicago area through his wholly owned professional corporation, AAP.[1] In April or May 1977, prompted by recent changes in the tax laws, Schwarz began to consider setting up a defined benefit pension plan to supplement AAP's defined contribution and profit-sharing plans. In July of that year, after having received a written pension plan proposal from William M. Mercer, Inc., Schwarz ran into an acquaintance, David Cooper, a field underwriter for Home Life Insurance Co. of New York. This chance meeting led to a subsequent session later in the month with both Cooper and Robert Canapary, another field underwriter for Home Life (as well as a registered representative for the sale of securities).

At this meeting, Schwarz showed Canapary a copy of the Mercer proposal. Canapary suggested that a different plan might allow AAP to make larger contributions than the Mercer plan permitted. With Schwarz's agreement to look at any proposal he might put forward, Canapary arranged for Eric Kranke, president and sole shareholder of Pension Actuaries, Inc., to prepare cost-illustrations for a defined benefit pension plan that would allow the maximum tax-deductible contributions. After considering one of Kranke's cost-illustrations later in the month, Schwarz gave the go-ahead to Canapary, leading to AAP's adoption of the Home Life Prototype Defined Benefit Plan and Trust.

Schwarz and his wife, Joanne, completed documents for the prototype plan and trust, as well as a participation agreement, on the last business day of July 1977 in the Chicago offices of Levenfeld, Kanter, Baskes & Lippitz, who had been AAP's lawyers since 1968. The prototype plan named the Schwarzes as plan trustees, and AAP as plan administrator. The plan also

---

1. AAP was previously known by two other names. The opinion will not distinguish AAP from its predecessors, since, due to Schwarz's total ownership, the distinction is irrelevant.

provided for the appointment of an investment manager, but stated that if none were named in the participation agreement or trust agreement, this responsibility would shift to the named trustees. The first participation agreement listed the Schwarzes (in their role as trustees) as the "Plan Investment Manager." Final Pretrial Order, Agreed Statement of Uncontested Facts ("UF") paras. 73–74. The participation agreement further indicated that AAP planned to fund the plan through the purchase of life insurance and flexible or variable annuities (or both types of annuities). Upon adoption of the defined benefit plan, AAP terminated the profit-sharing plan.

Canapary and Cooper, along with Ronald Aure, another Home Life field underwriter and Cooper's supervisor, sold two Home Life contracts to fund the new AAP defined benefit plan. One was the Home Life Flexible Annuity ("FA"), a contract which allowed participants to accumulate retirement funds at guaranteed interest plus a variable rate to be set at the beginning of each year (the variable rate was later adjusted more frequently, as will be discussed below). The other was the Pension Series Whole Life ("PSWL") contract, a policy providing for a $10,000 death benefit and accumulating cash value for use upon retirement or withdrawal from the plan. The FA was used to fund AAP's defined contribution plan as well. Canapary and Aure received commissions on contributions made to the FA and premiums paid on the PSWL. Prior to July 1977, Schwarz, as trustee of the defined contribution and profit-sharing plans, had handled their investment portfolios, purchasing such investments as equity securities, bonds and real estate.

Home Life is a mutual life insurance company incorporated under New York law. Its development of the FA in 1974–75 was an attempt to meet competition in the tax-sheltered annuity market and respond to the demand for tax-favored retirement programs created by the passage of ERISA in 1974. UF 115. AAP's plans purchased the first version of the FA, offered in 1975. This version permitted two ways of making contributions under the contract. Under the "periodic contribution" form of the FA, contributions were made on a regular yearly basis; the minimum contribution was $240 and the maximum was 300% of the scheduled contribution stipulated in the contract. Each annual contribution bore an administration charge of 6.75% per year, $15 per year and $1 for each contribution payment. The alternate funding method permitted minimum lump-sum contributions of $2,000; there was a one-time charge of $25 per participant, plus 5% of the first $50,000 contributed, 2% of the next $50,000, 1% of the next $100,000, and ½% of any excess over $200,000. All contributions were held in Home Life's general asset account, rather than in separate accounts.

During this initial accumulation phase of the 1975 FA, Home Life guaranteed the principal amount of contributions (less sales and administration charges) made on behalf of pension plan participants and any interest credited upon these contributions. The FA provided a guaranteed minimum interest rate plus a variable excess rate. The guaranteed rate was set at 7% during the first year, 6% for the next two, 5% for the two years after that, and 4% for the remainder of the contract. UF 145; Joint Trial Exhibit ("JTX") 489; Plaintiffs' Exhibit ("PLX") 29. The variable rate, designed to take advantage of fluctuating returns on investments made by Home Life, was set at the beginning of each year and was guaranteed for contributions made during the entire year. JTX 489; PLX 29; Allan Dep., at 271–72, Plaintiffs' Summary Judgment Exhibit ("PSJX") A. Although the excess interest rate was not altered during the year on the 1975 version of the FA, the excess interest rate on new and accumulated deposits could change from year to year, based upon Home Life's predictions of investment return. *Id. See also* PLX 915 and 917–21. For example, a statement dated December 31, 1978, promised Schwarz interest of 7% on his FA during 1979; the following year, interest was to be credited in the amount of 8.45% on contributions made prior to January 1,

1980, and 9% on contributions made after December 31, 1979. PLX 915.

Contributions to the FA totaling $683,-797.51 were made on behalf of AAP's employees from August 5, 1977, to August 24, 1979. Premiums paid on the PSWL totaled $270,000 between August 1977 and July 1984. In 1980, Home Life discontinued the 1975 version of the FA, altering the sales and administration charges and reducing the guaranteed interest rates (7% in the first year; 4% thereafter). The 1980 version was subsequently discontinued in 1982, when yet another version of the FA was introduced. Sometime in 1980 or 1981, in response to volatile interest rates, Home Life reserved to itself the right to alter interest paid on new contributions as often as once per month, rather than annually. This current excess rate was declared in advance and was guaranteed to be paid on contributions made under that rate for the remainder of the year, regardless of subsequent changes in the current rate. Changes in the current rate, moreover, did not affect the rate paid on deposits that had already been made; rates on existing deposits were still declared in advance for the entire year. PLX 138; PLX 915; PLX 917–21; Smith Dep., at 53–58, PSJX M; Fabian Dep., at 105–05, PSJX G.

Home Life marketed the FA as a group annuity contract ("GAC") in order to avoid the delay and expense of submitting an individual contract to the insurance departments of all of the states. This also permitted Home Life to sell the contract without seeking approval from the New York Department of Insurance for a substantial modification of the company's plan of operations to provide for the new method of interest rate declarations to be used on the FA. UF 162.

The insurer originally wished to issue the FA through a trust established with a New York bank, which would hold the GAC. UF 163. Home Life had envisioned the GAC as a means of allowing individual employees whose employers or unions did not offer pension plans to obtain benefits similar to those offered in company- or union-sponsored plans. UF 166. The in-surance department, however, by letter dated June 30, 1975, advised Home Life that the contract did not qualify under N.Y. Insurance Law § 223 (now § 4238), regulating issuance of group annuity contracts, because "the participants ... do not qualify as a group under ... Section 223." UF 169.

Thwarted in New York, Home Life turned to the Rhode Island Hospital Trust National Bank ("HTNB"), located in Providence. Home Life submitted copies of the GAC to the State of Rhode Island Department of Insurance. UF 171. Pursuant to negotiations between Home Life and HTNB, the bank declared the Home Life Qualified Corporate Plan Trust (as well as other group trusts not at issue here) and executed the trust document on October 1, 1975. PLX 35.

Under the terms of the trust, a corporation adopting the Home Life prototype defined contribution plan or the trustees of the corporation's pension trust could apply to participate in the Qualified Corporate Plan Trust. Such corporations or trustees were referred to under the Qualified Corporate Plan Trust as "applicants," and in the case of AAP, the "applicants" were the Schwarzes. Qualified Corporate Plan Trust, Art. I; UF 205. The Applicants would make contributions to the trust on behalf of the participants in their pension plans; the participants would enroll in the trust by filing a "participation agreement" with the Qualified Corporate Plan Trust. UF 190–91. The Qualified Corporate Plan Trust provided that upon HTNB's receipt of the contributions, "[t]he Trustee shall cause to be issued to it a group annuity contract or contracts from Home Life." Qualified Corporate Plan Trust, Art. II. HTNB would then be the legal owner and holder of the FA on behalf of the applicants, participants and their beneficiaries. *Id.* Home Life would issue FA certificates, address them to the applicants, and then mail them to HTNB, which would forward them to the recipients. UF 196.

Article VI of the Qualified Corporate Plan Trust permitted HTNB as trustee to contract with an agent to provide adminis-

trative services to the trust. Contemporaneous with the creation of the trust, HTNB appointed Home Life as the administrator of the Qualified Corporate Plan Trust. UF 210–11. The effect of this agreement was to turn over to Home Life all (or nearly all) of the administration of the trust, including the collection of contributions from applicants and participants.

Under this arrangement, contributions on behalf of the AAP plan participants and other FA certificate holders were mailed to Home Life, which deposited them immediately to its general account. On the same day that Home Life received contributions it would wire an equal amount to HTNB, which would return-wire an equal amount the following Monday. HTNB thus had use of these funds from three and one-half to seven days without paying interest upon them; this float, of course, accrued to the benefit of the bank, though the funds were not set aside for any particular uses. UF 183–187; Butzier Tr., at 94–99, PSJX E; Frazier Dep., at 141–46, 148–51, PSJX I; Beattie Dep, at 25–30, 130–31, PSJX B. The float arrangement was not disclosed in the Qualified Corporate Plan Trust as one of the fees to which the bank was entitled, though a Home Life internal memorandum described it as "an additional operating margin for their trust services." PLX 9. But though the bank did not pay interest upon the wired funds, Home Life credited interest upon the contributions from the day of their receipt, even before the checks it received from the FA contributors had cleared. UF 251. In January 1984, Home Life estimated the annual cost of this "negative float" to have been about $50,000.

Upon retiring or otherwise withdrawing from the program, a participant had the option of annuitizing the contract or receiving a lump-sum distribution. To annuitize the FA, the participant would surrender his GAC certificate to Home Life, which in return would issue a supplemental annuity contract. UF 216. By far the more popular option was the receipt of lump-sum benefits. From November 1975 through January 1986, only ninety-one certificate holders of the 10,000 who surrendered their certificates elected the annuity. UF 219–20.

Between April and June 1980, AAP hired new attorneys for advice on the company pension plans, among other matters. UF 270. Schwarz testified that he sought these lawyers' advice because AAP employees had complained of confusing information from Home Life and because the company accountant had informed him that some of the Home Life tax forms "didn't seem satisfactory." Schwarz Dep., at 511–12, Canapary MSJ Ex. A. During the course of the ensuing investigation, Schwarz concluded that various misrepresentations had induced his company to pay too much money to Home Life for too little benefit. *Id.* This lawsuit followed.

## III. SECURITIES CLAIMS

Plaintiffs' claims under the federal securities laws all fail for the same fundamental reason: Neither the FA nor the PSWL is a security. Because the closest question in this case is posed by the FA, the Court will explain first why that contract was not a security.

The federal securities laws require the courts to give effect to two competing policies. The first policy is set out by the broad statutory definition given to the term "security," which includes within its scope, among other instruments, "investment contract[s]." *See* § 2(1) of the 1933 Act, 15 U.S.C. § 77b(1); § 3(a)(10) of the 1934 Act, 15 U.S.C. § 78c(a)(10). The competing policy is codified in § 3(a)(8) of the 1933 Act, exempting from federal regulation "[a]ny insurance or endowment policy or annuity contract or optional annuity contract, issued by a corporation subject to [state regulation]." 15 U.S.C. § 77c(a)(8). As the Seventh Circuit has held, any instrument that qualifies as an insurance or annuity contract under § 3(a)(8) of the 1933 Act is insulated from private actions brought under the 1934 Act. *Otto v. Variable Annuity Life Ins. Co.*, 814 F.2d 1127, 1130 (7th Cir.1986), *cert. denied*, 486 U.S. 1026, 108 S.Ct. 2004, 100 L.Ed.2d 235 (1988).

The basic principles were set forth in a pair of Supreme Court decisions, see *SEC*

v. *Variable Annuity Life Ins. Co. ("VAL-IC"),* 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959), and *SEC v. United Benefit Life Ins. Co.,* 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967), establishing that insurance products can be treated as securities under the federal laws if the contracts place too much of the investment risk on policyholders. *See also SEC v. C.M. Joiner Leasing, Inc.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943). (Although Professors Loss and Seligman have questioned whether Congress ever intended this result, see L. Loss & J. Seligman, *Securities Regulation,* at 1000–02 (3d ed. 1989), it of course is not this Court's prerogative to ignore binding authority.) The SEC has wrestled with these questions as well; after extensive consideration, the agency promulgated Rule 151, 17 C.F.R. § 230.151, a safe-harbor provision that became effective on June 4, 1986 (and which the Court sets out in full later in this memorandum opinion). In putting forward Rule 151, the SEC promised that it would not treat as securities insurance products that met the rule's requirements. The Seventh Circuit carefully analyzed Rule 151 and Supreme Court precedent in *Otto.* Because this Court concludes that the analysis in *Otto* and the terms of Rule 151 control the result here, the Court will discuss that case at length.[2]

The first point to observe about *Otto* is that it is really two opinions, decided upon different assumed facts concerning the insurance contract at issue. Initially, the court of appeals held that the contract was not a security, and thus affirmed the district court's entry of summary judgment in favor of the insurer. 814 F.2d at 1130–34. Upon rehearing, after the insurer disclosed further information concerning the contractual terms, the court of appeals reversed its previous decision to hold that the contract was indeed a security. *Id.* at 1140–42.

When *Otto* was first decided, the facts were understood as follows. Variable Annuity Life Insurance Co. ("VALIC") had issued a contract which it termed a fixed annuity. It guaranteed the principal paid into the annuity, as well as interest at a minimum rate of 4% per year for the first ten years, and 3½% thereafter. The insurer held funds paid by annuitants in its general account and invested them in a variety of long-term instruments, generally in the form of debt, such as mortgages and bonds. Upon retirement, the beneficiary could either withdraw the amount accumulated in a lump sum or use it to buy an annuity. *Id.* at 1129.

The distinguishing characteristic of the fixed annuity was its excess interest provision, allowing the insurer, at its discretion, to pay interest on top of the guaranteed rate. *Id.* The plaintiff class alleged that the insurer had failed to disclose the manner in which it calculated the excess interest. This method, known as "banding" or "new money," paid the current rate of interest on current contributions only; previous contributions (so the court of appeals had been led to believe) would continue to earn interest at the excess rates declared at the time the previous contributions had been made. *Id.* at 1130. The current excess rate, however, could be changed at any time.

The court of appeals analyzed the question in two stages. First, the court considered the matter under the law developed in the Supreme Court's decisions, as well as the Seventh Circuit's own decision in *Peoria Union Stock Yards Co. v. Penn Mutual Life Ins. Co.,* 698 F.2d 320 (7th Cir.1983). The court noted that the fixed annuity had been promoted as a method of saving for retirement, rather than as an investment device. Funds paid into it were held in the insurer's general account, and were invested in safe securities, largely debt. Principal was guaranteed, as was the base

---

**2.** *Peoria Union Stock Yards Co. v. Penn Mutual Life Ins. Co.,* 698 F.2d 320 (7th Cir.1983), is distinguishable on its facts from the contract at issue here. The instrument there provided no guarantee of a minimum rate of interest after three years of the contract's life, *Id.* at 322, and

the case was decided on a motion to dismiss, rather than on summary judgment, *id.* Given *Otto's* far greater factual and procedural similarity, the Court believes that it, not *Peoria Union,* controls the disposition of the securities claims in this case.

amount of interest, which though low, "was not so low that ... it placed the investment risk on the policyholder in a way substantial enough to make the fixed annuity a security." *Otto*, 814 F.2d at 1132.

The court further contrasted the fixed annuity with the insurer's variable annuity, which all agreed was a security. The variable annuity guaranteed neither principal nor interest, *id.* at 1129, and the amounts invested were kept in a special account, *id.* at 1133. The contractholder's investment was directly tied to the success of the investment portfolio, which consisted of equity securities. *Id.*

In the second stage of its analysis, the court of appeals examined the fixed annuity under the test set out in SEC Rule 151, and concluded that Rule 151 "supported" the court's holding that the contract was not a security (though the court noted that the rule did not literally apply because it was adopted after the sale of the fixed annuity). *Id.* Rule 151 provides:

(a) Any annuity contract or optional annuity contract (a "contract") shall be deemed to be within the provisions of section 3(a)(8) of the Securities Act of 1933 [citation], *Provided,* That

(1) The annuity or optional annuity contract is issued by a corporation (the "insurer") subject to the supervision of the insurance commissioner, bank commissioner, or any agency or officer performing like functions, of any State or Territory of the United States or the District of Columbia;

(2) The insurer assumes the investment risk under the contract as prescribed in paragraph (b) of this section; and

(3) The contract is not marketed primarily as an investment.

(b) The insurer shall be deemed to assume the investment risk under the contract if:

(1) The value of the contract does not vary according to the investment experience of a separate account;

(2) The insurer for the life of the contract

(i) Guarantees the principal amount of purchase payments and interest credited thereto, less any deduction (without regard to its timing) for sales, administrative or other expenses or charges; and

(ii) Credits a specified rate of interest (as defined in paragraph (c) of this section) to net purchase payments and interest credited thereto; and

(3) The insurer guarantees that the rate of any interest to be credited in excess of that described in paragraph (b)(2)(ii) of this section will not be modified more frequently than once per year.

(c) The term "specified rate of interest," as used in paragraph (b)(2)(ii) of this section, means a rate of interest under the contract that is at least equal to the minimum rate required to be credited by the relevant nonforfeiture law in the jurisdiction in which the contract is issued. If that jurisdiction does not have any applicable nonforfeiture law at the time the contract is issued (or if the minimum rate applicable to an existing contract is not longer mandated in that jurisdiction), the specified rate under the contract must at least be equal to the minimum rate then required for the individual annuity contracts by the NAIC Standard Nonforfeiture Law.

17 C.F.R. § 230.151. The rule is a safe harbor only; failure to meet its requirements thus would not necessarily cause an insurance product to be treated as a security, but merely would open it to analysis under the law interpreting §§ 2(1) and 3(a)(10). *See* Definition of Annuity Contract or Optional Annuity Contract, Exchange Act Release No. 6645 [1986–87 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 84,004 (May 29, 1986).

The fixed annuity in *Otto* met all of the requirements of Rule 151 except for the yearlong guarantee of excess interest. 814 F.2d at 1134. It therefore failed the express terms of 151(b)(3), and thus would not have qualified for Rule 151's safe harbor. The court of appeals, however, determined the lack of a yearlong guarantee to

be of no consequence. In reaching this conclusion, the court examined the SEC's explanation of the rule in Release No. 6645, which promised a flexible approach to the one-year requirement. The court of appeals concluded:

> Although VALIC does not guarantee that it will leave the excess interest unchanged for a year, it does use the "banding" method of computing interest. Under this method, VALIC in effect guarantees the excess interest rate on every deposit for the life of the annuity contract. In its discussion of Rule 151 that was released with the rule's enactment, the SEC made clear that it considered the banding method, or in the SEC's words, the "payment basis" of computing interest, as satisfying this second requirement of Rule 151.

*Id.* (footnote omitted).

But the court of appeals had been misinformed as to the nature of the fixed annuity. Upon rehearing, VALIC informed the court that it retained the "unfettered discretion" to alter (or even eliminate) the amount of excess interest on past contributions at any time. *Id.* at 1140–41. In its brief on rehearing, the insurer told the court: " 'Excess interest is wholly discretionary; with its unfettered discretion, VALIC can calculate excess interest by any method it chooses, it can elect to change the current interest rate paid on deposits, it can change the rates on past contributions, and (although competition makes it unlikely) it can stop paying excess interest altogether—at any time.' " *Id.* at 1141. VALIC argued that despite the uncertainty of the excess interest, the "substantiality" of the guaranteed rates sufficed to make the fixed annuity an exempt insurance product. *Id.*

VALIC's argument failed to persuade the court of appeals, which concluded that the fixed annuity placed too much investment risk on the contract buyer to escape classification as a security. The excess interest rates of 4% and 3½%, though slightly above the 3% required under Rule 151, could not by themselves insulate the fixed annuity from the federal securities laws. Payment of some excess interest was necessary, and the fixed annuity's promise was too contingent. *Id.* at 1142. In reaching this decision, the court dwelled on VALIC's right to change the rate of excess interest at will: "A claimed right to change established excess interest rates and to eliminate excess interest payments entirely *at any time* surely tends to shift the investment risk from VALIC to the plan participant." *Id.* at 1141. The emphasis in the quoted passage was the court of appeals' own.

■ A number of points are fairly derived from *Otto.* The most important here is the propriety of referring to Rule 151 in considering whether any insurance contract is a security, including the contracts at issue in this case. In this Court's view, it is of no consequence that the SEC adopted Rule 151 after the plaintiffs began investing in Home Life's FA (the FA was first offered in 1975 and the plaintiffs paid into it from 1977 to 1979). The requirements set forth in Rule 151 for a guaranteed exemption from federal securities regulation represent the carefully considered views, developed in the course of notice and comment rulemaking, of the federal agency with the greatest expertise in this matter; the principles established are timeless, and ought to be followed by the courts even though not binding upon them.[3]

---

**3.** The SEC takes this view. Release No. 6645 notes: "Any insurer that is unable, or chooses not, to rely on Rule 151 may still look to the rule and accompanying releases for interpretive guidance. The rationale underlying the conditions set forth in the rule is relevant to any section 3(a)(8) determination." Fed.Sec.L.Rep. ¶ 84,004, at 88,138. Plaintiffs, however, argue that the FA would not have qualified under the SEC policy that governed at the time that the FA was issued. The refer to Exchange Act Release

No. 6051, 44 F.R. 21626 (April 11, 1979). This release was withdrawn with the adoption of Rule 151, because of the SEC's "reservations about its continued usefulness." Fed.Sec.L.Rep. ¶ 84,004, at 88,138. In light of this fact, the Court does not consider the SEC's previous policy, which was revised in response to informed criticism, binding on the question whether an instrument is a security. *Cf. Otto,* 814 F.2d at 1133–34 (applying present policy embodied in Rule 151 to fixed annuity purchased in 1975).

To conclude otherwise would lead to untenable results. Identical insurance products could be classified differently depending on whether they were sold before or after Rule 151's adoption, even though the time of sale should not be pertinent to the question whether an insurance contract is a security. Furthermore, while the courts might not be constrained to follow the SEC's rule, their failure to do so could allow a private securities litigant to recover damages based upon the sale of an instrument that the SEC would not have considered subject to its own regulatory authority. The Court therefore believes that if the insurance contracts at issue here meet the requirements of Rule 151, they are entitled to exemption from attack under the federal securities laws.

■ The next point that must be considered is how to tell a security from a non-security under the rule of *Otto*. The distinction appears to rest on the frequency with which the insurer can alter the rate of excess interest on existing contributions under the contract. It seems clear that an annuity contract which allows the insurer to alter the rate of excess interest on past contributions at any time will be deemed a security under *Otto*. On the other hand, a contract that allows the excess rate to be periodically readjusted for new contributions, but which guarantees that for the life of the contract each contribution will continue to receive the rate prevailing at the time it was made, will not be deemed a security. As will be seen below, Home Life's FA does not clearly fall into either category of instrument. But though *Otto* does not absolutely dictate this Court's conclusions one way or the other, the Court believes that the case, properly understood, supports the conclusion that the FA is not a security.

The Court now considers the requirements of Rule 151 as applied to the FA. Initially, the Court observes that the FA qualifies under the preliminary requirement that it be "[a]n annuity contract or optional annuity contract." Rule 151(a). The FA began with an accumulation phase in which participants contributed toward their retirement income; upon withdrawal, the participants could either purchase an annuity from Home Life or receive a lump-sum payment of their accumulated contributions. Though relatively few participants may have chosen the annuity option (according to UF 219–20, only ninety-one of the ten thousand FA certificate holders who surrendered their certificates between 1975 and 1986 chose the annuity option), this fact alone does not affect the FA's status as an annuity or optional annuity contract under Rule 151. It is similar in this regard to the fixed annuity in *Otto*, and there was no question that the contract in that case was an annuity. This point aside, the Court turns to the three substantive requirements stated in subsection (a) of Rule 151.

First, Home Life's regulation by the States of New York and Rhode Island satisfies the requirement of Rule 151(a)(1), which dictates that the corporation issuing the annuity or optional annuity be subject to state regulation. Plaintiffs have suggested that Home Life sold the FA as a group annuity contract through HTNB (as trustee) in Rhode Island, because at the time, Rhode Island, unlike New York, had no statute regulating the issuance of group annuities and no written standards of approval specifically applicable to annuities. *See generally* UF 162–172. Home Life itself has stipulated that it designed the FA as a group annuity contract to avoid the delay and expense of submitting individual contracts to the insurance departments of all of the states, and so that it would not have to seek the New York Department of Insurance's approval for a substantial modification in its plan of operations. UF 162.

On the other hand, plaintiffs do not contest that Home Life submitted copies of the group annuity contracts related to the FA to the State of Rhode Island Department of Insurance in 1975. *Id.* 171. Before adopting its safe harbor rule, the SEC noted that one commentator had proposed an alteration in the wording of Rule 151(a)(1), suggesting that " 'the contract itself be subject to state regulation as an annuity or insurance contract.' " Fed.Sec.L.Rep. ¶ 84,004, at 88,129. The Commission, however, re-

jected this proposal, believing that regulation of the company itself was sufficient, provided that the insurance product involved was a "bona fide annuity contract[ ]." *Id.*

As the Court has already found, the FA is an annuity contract. There is no question that Home Life is an insurance company subject to state regulation in New York and Rhode Island (and wherever else it is licensed to do business, for that matter) and thus it complies with the literal language of the rule. According to the statement of uncontested facts presented to this Court, the documents related to the FA were submitted to the Rhode Island insurance department for approval. The Court thus concludes that the FA satisfies the requirements of Rule 151(a)(1).

The Court also finds that the FA satisfies the requirements of Rule 151(a)(3) because it was "not marketed primarily as an investment." Plaintiffs' argument to the contrary takes two forms. First, they point to Home Life's sales literature for the FA (see JTX 489), cull isolated passages referring to the investment aspects of the FA (including the desirability of the excess interest as a way of taking advantage of fluctuating interest rates), and argue that these show that it was marketed primarily as an investment. Similarly, Schwarz claims that the sales pitch for the FA emphasized Home Life's abilities in the management and investment of money. PSJX L.

■ The Court, however, concludes that JTX 489 does not, when read as a whole, promote the FA primarily as an investment. The document repeatedly stresses that the FA is a method of saving for retirement, with guaranteed principal, guaranteed interest, and a guaranteed life income (through purchase of a annuity with the accumulated funds). The last part of the document is a section entitled "Financial Security Assured." Undoubtedly the document refers to the investment aspects and tax-favored features of the plan, and the Court does not question that Home Life and its representatives promoted the company's investment abilities in hawking the FA. But that is simply a consequence of the FA's nature as a retirement funding vehicle; shrewd investment is necessary in order to save enough for comfortable retirement. As the Seventh Circuit noted in *Otto*, "[I]nvestment management is the 'life blood' of life insurance companies ... and thus it was not inappropriate for [the defendant insurer] to tout its investment experience even in relation to an insurance product." 814 F.2d at 1132 (quoting *Peoria Union*, 698 F.2d at 322). The SEC's view is the same: "[A] marketing approach that fairly and accurately describes both the insurance and investment features of a particular contract, and that emphasizes the product's usefulness as a long-term insurance device for retirement or income security purposes, would undoubtedly 'pass' the rule's marketing test." Fed.Sec. L.Rep. ¶ 84,004, at 88,137 (footnote omitted). Similarly: "[T]he Commission is not saying, nor has it ever said, that an insurer in marketing its product cannot describe the investment nature of the contract, including its interest rate sensitivity and tax-favored status." *Id.* (footnote omitted).

Plaintiffs' second line of argument is that the public perceived the FA as an investment vehicle, a fact recognized by Home Life and its employees and reflected in its internal documents. For example, one memorandum written in June 1979 after a Home Life employee had attended a seminar on flexible annuities stated that "[t]he public perceives the Flexible Annuity as an investment as opposed to an annuity." PLX 62. The Home Life legal department advised in a November 1978 memorandum that the importance of the annuity aspects of the contracts had diminished as purchasers "focused greater attention on the investment return of contracts during the accumulation period." JTX 115. Plaintiffs point out that Home Life later amended its literature describing the FA to delete discussion of the FA's investment aspect and to emphasize its value as a retirement savings vehicle. PLX 63. As further evidence, plaintiffs cite the low rate of participants who chose to purchase annuities upon terminating their FAs (ninety-one of the ten thousand FA certificate holders

who surrendered their certificates between 1975 and 1986, UF 219–20). They also cite an internal publication giving agents tips on how to sell the FA by informing prospects of the company's investment record. PLX 61.

In the Court's view, the public perception of the FA does not control the question whether it was marketed primarily as an investment. Rule 151 does not ask how the public perceives the insurance product; it merely asks how the insurer promoted it. Plaintiffs imply that the FA must have been marketed as a security if the public saw it as an investment. But even assuming that the public considered the FA an investment, the inference does not reasonably follow that the FA was promoted primarily as an investment, rather than as an insurance device for the accumulation of retirement savings. The tax law and other statutes have created incentives for the use of retirement plans; whether participants use them for investment purposes, rather than for retirement, is beyond the control of an insurer's marketing efforts. As for Home Life's revision of its marketing materials, this display of caution is hardly a confession of previous error. Regarding the internal publication with the sales tips (PLX 61), plaintiffs neglect to point out that the publication stated Home Life's primary competitors in the pension-funding market were banks and savings and loans, not securities-trading firms. This hardly supports the inference that Home Life was marketing the FA as a securities investment substitute. Having examined Home Life's promotional material, the Court is satisfied that the company did not primarily market the FA as an investment, and that no rational jury could find to the contrary.

This leaves the third and final requirement, the assumption of investment risk by the insurer. This requirement is found in Rule 151(a)(2), which in turn relies upon a test stated in Rule 151(b). Rule 151(b) sets forth three conditions for the insurer to be considered as having assumed the investment risk.

First, 151(b)(1) mandates that the value of the contract "not vary according to the investment experience of a separate account." Both sides agree that contributions to the FA were placed in Home Life's general account. *See* UF 185. Plaintiffs, however, argue that Home Life's use of the "investment generation method" ("IGM") for allocating interest to particular contributions effectively created a separate account for the FA. Roughly stated, the IGM permits Home Life to track investment income to specific "generations" of assets purchased by Home Life and consider this information in setting the interest rates to be paid to contributions made during time periods when a particular asset generation had been in effect. *See, e.g.,* UF 256–59; Allan Dep., at 25–31, PSJX A; Brophy Dep., at 56–58, 86–7, PSJX D. The SEC's explanation of Rule 151 in no way indicates that using the IGM has the same effect as segregating assets in a separate account, per Rule 151(b)(1). To the contrary, the reason for the general account rule is to ensure "that the assets of the insurer's general account will be available to meet the guarantees provided under the contract without resulting in additional investment risk." Fed.Sec.L.Rep. ¶ 84,004, at 88,131. All evidence before this Court indicates that Home Life's general assets stood behind its guarantees with respect to the FA. The Court therefore considers the general account requirement met.

Second, 151(b)(2)(i) requires the insurer, for the life of the contract, to guarantee the principal of purchase payments and interest credited thereto (less deductions for sales and other expenses). Again, it is uncontested that Home Life guarantees the principal amount of contributions under the FA and any interest actually credited to these deposits. UF 221; JTX 489. In addition, Rule 151(b)(2)(ii) requires an insurer to pay a minimum rate of guaranteed interest upon principal and interest previously credited thereto. Rule 151(c) sets this minimum rate no lower than "the minimum rate required to be credited by the relevant nonforfeiture law in the jurisdiction in which the contract is issued." If there is no such nonforfeiture law in the jurisdic-

tion, the minimum rate must be no lower than the minimum required at the time under the National Association of Insurance Commissioners Standard Nonforfeiture Law. The NAIC standard rate was 3%, as were the standard rates for individual annuity contracts in Illinois and New York (Rhode Island does not appear to have a nonforfeiture law). *See Otto,* 814 F.2d at 1134; Ill.Rev.Stat. ch. 73, para. 841.4; N.Y. Insurance Law § 4223. The FA guaranteed annual interest of 7% in the first year, 6% for the next two years, 5% for the two years after that, and 4% for the remainder of the contract. The FA thus complies with both subrequirements of Rule 151(b)(2).

The third and last requirement of Rule 151(b) is that if the insurer agrees to pay excess interest, it must guarantee "that the rate ... will not be modified more frequently than once per year." Rule 151(b)(3). This rule does not prevent an insurer from changing the rates on accumulated deposits, but merely requires that any rates set on existing deposits not be changed more frequently than once annually. *See generally* Fed.Sec.L.Rep. ¶ 84,004, 88,133–36; *see id.* at 88,136 ("Once determined, the rate of excess interest credited *to a particular purchase payment or to the value accumulated under the contract* must remain in effect for at least the one-year time period established by the rule.") (emphasis supplied).

The plaintiffs made their deposits from 1977 to 1979, and during this time period, excess interest rates were declared at the beginning of the year for the entire year. The rates on past contributions, however, could change from year to year. Although plaintiffs assert that Home Life occasionally altered the rates on past contributions more than once per year, all of the evidence submitted to the Court belies this assertion. Home Life's description of its FA promised that rates would be declared at the start of the year and would remain unchanged for the whole year. JTX 489. *See also* PLX 29 (copy of group annuity contract) and PLX 33 (group annuity certificate). The deposit summaries issued to the plan participants indicate that the rates

declared annually on past contributions remained in effect for an entire year. PLX 915 and 917–21. This conclusion is further supported by the testimony of Home Life officers and employees. *See, e.g.,* Allan Dep., at 271–72, PSJX A.

Plaintiffs confuse this issue by referring to Home Life's use of the IGM for allocating interest to particular contributions. *See, e.g.,* UF 256–59; Brophy Dep., at 56–58, 86–7, PSJX D. While it may be true, as plaintiffs assert, that Home Life could "reband" assets into new investment generations at any time, this is not the same thing as changing the rate of interest on past contributions under the FA. Plaintiffs have failed to produce any evidence that the interest paid on past contributions was ever altered more than once per year. In light of the overwhelming evidence to the contrary, this contention of plaintiffs cannot prevail.

One thing that did change, however, was the frequency with which the current excess rate could change. Beginning in 1980 or 1981 (the date is uncertain, but it is after the plaintiffs ceased putting money into the FA), Home Life began altering the excess rate of interest on *new* contributions more often than once a year, reserving the right to do so each month. This was in response to volatile interest rates. *See* PLX 138; PLX 915; PLX 917–21; Smith Dep., at 53–58, PSJX M; Fabian Dep., at 104–05, PSJX G. The current rate declared on a new deposit was guaranteed for that deposit through the remainder of the calendar year; subsequent changes in the current rate, however, did not affect deposits that had already been made. Smith Dep., at 53, 57, PSJX M. The SEC specifically signed off on this variation as permissible under Rule 151. *See* Fed.Sec.L.Rep. ¶ 84,004, at 88,134–35 (note particularly *id.* at 88,134 n. 27 and 88,135 n. 29).

Thus, the FA satisfies the requirements of Rule 151(b)(3), as well as all the other requirements of the rule. The sole remaining question is whether there is anything in *Otto* to prevent this Court from concluding that the FA is not a security. Plaintiffs argue that the Seventh Circuit's change of

position on rehearing resulted from "the disclosure by VALIC ... that the issuer claimed the right to alter, at its unfettered discretion, the interest rates paid on past fixed annuity plan contributions." Reply Brief, at 43. This Court, however, believes that the significant difference was not the right to alter the rates paid on past contributions, but, in the words of the Seventh Circuit, the "claimed right to change established excess interest rates and to eliminate excess interest payments *at any time.*" 814 F.2d at 1141 (emphasis in original).[4]

It is true that in initially finding that the fixed annuity in *Otto* was not a security, the court of appeals believed that a declared rate on a contribution could never be altered. *See id.* at 1134. But given the Seventh Circuit's reliance on Rule 151 and the SEC's explanation of that rule, this Court cannot believe that the court of appeals would have found the fixed annuity in *Otto* to have been a security if it had been identical to Home Life's FA. Under the rule, it is not the possibility of altering the interest rate on past contributions that deprives an insurance contract of the safe harbor; it is the frequency with which the rate on past contributions can be altered.

■ Having thus explained at great length why the FA is not a security, the Court can far more briefly conclude that the PSWL is an exempt insurance contract. The Court has been provided with a specimen of the policy issued. PLX 96. The policy on its face appears to be nothing more than a policy of whole life insurance with an option to annuitize, setting a premium of $223.60 for $10,000 of coverage.

Nevertheless, citing *Grainger v. State Security Life Ins. Co.*, 547 F.2d 303, 307 (5th Cir.1977), *cert. denied sub nom. Nimmo v. Grainger*, 436 U.S. 932, 98 S.Ct. 2832, 56 L.Ed.2d 777 (1978), plaintiffs ar-

gue that the premiums on the PSWL were "disproportionately high ... in relation to the amount of the death benefit," and therefore assert that there is a genuine issue of material fact concerning whether the PSWL is a security. *Grainger* is of little help to plaintiffs because it was decided on a motion to dismiss and involved an entirely different sort of policy (it was denominated a "Variable Investment Plan" and contained an incidental death benefit). Moreover, plaintiffs have completely failed to put forward evidence establishing that the PSWL required disproportionately high premiums or was otherwise anything other than what it purports to be on its face. Instead, they point to the allegations that they made in their Third Amended Complaint. A party confronted with a properly supported summary judgment cannot rest upon his pleadings; he must come forward with evidence of his own sufficient to establish a genuine dispute of material fact. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983).

The only evidence that plaintiffs have pointed to is Schwarz's testimony that the PSWL, like the FA, was promoted on the basis of Home Life's investment skill. Schwarz Dep., at 230, PSJX L. But Schwarz further described the sales pitch for the PSWL as promising a way to provide a current death benefit with accumulation for retirement. This, of course, accurately describes a whole life policy. R. Keeton & A. Widiss, *Insurance Law* § 1.5(c) (1988). Plaintiffs have failed to establish a genuine dispute of fact concerning the character of the PSWL. The Court therefore holds that the PSWL is an insurance contract and not a security.

Since neither of the insurance contracts involved in this case are securities, all of the defendants are entitled to summary

---

4. In light of this quotation, in which the Seventh Circuit emphasized VALIC's freedom to alter excess interest rates at will, the Court cannot accept plaintiffs' argument that "[t]he *Otto* court simply did not qualify its holding on the basis of the frequency of the insurer's alteration of past interest bands." Response to Surreply, at 13. Some of plaintiffs' suggested distinctions are simply trivial. For example, in their response

to Home Life's motion for summary judgment, they state that *Otto* is different because it involved individual contracts, while the FA was issued pursuant to a group plan. Response and Trial Brief, at 19. This fact is irrelevant. *See* Fed.Sec.L.Rep. ¶ 84,004, at 88,127 n. 1 ("[T]hese contracts are issued on either an individual or a group basis.").

judgment in their favor on the plaintiffs' federal securities law claims.

## IV. ERISA CLAIMS

Plaintiffs' claims under ERISA fail because (1) HTNB is not an ERISA fiduciary, and even if it were, it breached no fiduciary duty; and (2) neither Home Life nor any of the other defendants are ERISA fiduciaries.[5]

### A. *Claims Against HTNB*

#### 1. The Erisa Plans

Before an entity may be liable as an ERISA fiduciary there must first be an ERISA plan. *See* ERISA § 4, 29 U.S.C. § 1003. Because the parties do not agree about the identification of the ERISA plans at issue here, the Court must resolve this preliminary dispute.

There is no question that AAP had established two ERISA pension plans for the benefit of its employees. *See* ERISA § 3(2), 29 U.S.C. § 1002(2). The corporation's first program was a defined contribution plan. AAP's subsequent decision to set up a second plan, a defined benefit program, led to this litigation. Schwarz and his wife are named trustees of both plans, and AAP is the plans' administrator. *See* ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2).

██ Plaintiffs argued, however, that the Qualified Corporate Plan Trust declared by HTNB for the purchase of the Home Life FA was also an ERISA "plan." Or at least this was the Court's understanding of plaintiffs' argument based upon their opening Memorandum in Support of their cross-motion for summary judgment.[6] But plaintiffs pulled back from this theory in their Reply and their Response to HTNB's Surreply. Citing *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir.1982), they state: "Plaintiffs here do not argue that the Trust, standing alone, constitutes an

ERISA plan. Rather, consistent with the reasoning in *Dillingham*, it is the establishment *and* operation of the Trust *coupled* with the Participation Agreement (PLX 85) that constitutes the HTNB trust as an ERISA Plan." Response to HTNB Surreply, at 7 (emphasis in original). Plaintiffs then assert that by entering into the float arrangement with Home Life, HTNB breached its fiduciary duties to this ERISA trust by using trust funds to its own benefit. However plaintiffs' argument be understood, the Court does not believe the Qualified Corporate Plan Trust to be an ERISA plan.

ERISA § 3(3) provides that "[t]he term 'employee benefit plan' or 'plan' " includes "an employee pension benefit plan." 29 U.S.C. § 1002(3). "Pension benefit plan" means "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both." ERISA § 3(2), 29 U.S.C. § 1002(2). "Employer" is defined as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." ERISA § 3(5), 29 U.S.C. § 1002(5).

As the juxtaposition of ERISA's definitional sections indicates, an entity cannot be an ERISA plan unless it is maintained by an employer, or someone acting "indirectly in the interest of an employer." Plaintiff first argues that HTNB acted indirectly in the interest of AAP and other employers by setting up the Qualified Corporate Plan Trust. Memorandum in Support, at 30. But this argument is without factual basis; while AAP and other employers could purchase the FA through the trust, the trust itself was set up by Home Life and HTNB to facilitate Home Life's marketing of the FA without seeking sepa-

---

**5.** Plaintiffs' complaint also alleges violations of the party-in-interest rules. *See generally* ERISA §§ 3(14) and 406, 29 U.S.C. §§ 1002(14) and 1106. However, plaintiffs have cited no evidence that any of the defendants engaged in any transactions prohibited under ERISA. Accord-

ingly, this theory cannot preclude entry of summary judgment against plaintiffs.

**6.** *See id.* at 29 ("Under the definitions of ERISA, the Home Life Qualified Corporate Plan Trust ('Trust') is an ERISA plan for which HTNB and Home Life are accountable as fiduciaries.").

rate approval of the contract form from the insurance departments of all the states. UF 162. It thus was nothing more than a device for the sale of Home Life's insurance product. To say that in setting up and overseeing the trust, HTNB was a "person acting ... indirectly in the interest of an employer, in relation to an employee benefit plan," bends the statutory phrase past the breaking point. In declaring the Qualified Corporate Plan Trust, HTNB was really acting in the interest of Home Life, which needed the trust for selling the FA. See generally the Court's recitation of the facts, Section II.

Perhaps because plaintiffs perceived the weakness of this assertion, they later shifted their argument to claim that the Qualified Corporate Plan Trust became an ERISA plan because of the participation agreements entered into by the participants in the AAP pension plans. Reply, at 26–29; Response to HTNB Surreply, at 7. The Court cannot understand how the added detail of the participation agreements somehow makes the declaration of trust a pension plan maintained by an employer or someone acting on an employer's behalf. The fact remains that the Qualified Corporate Plan Trust was a device for the sale of the FA.

Plaintiffs' invocation of *Donovan v. Dillingham, supra,* is fruitless, for as HTNB points out, that case, if anything, militates against holding the Qualified Corporate Plan Trust to be an ERISA plan. *Donovan* involved a multiple-employer trust ("MET"). A MET allows employers of relatively small numbers of employees to secure more favorable insurance rates by pooling their contributions. In carrying out this function, the MET in *Donovan* had acquired a group health insurance policy; employers and employee organizations could then "subscribe" to the MET in order to obtain health coverage for their employees or members. *Id.* at 1370. The similarities of the MET to the Qualified Corporate Plan Trust are apparent. Thus, the Eleventh Circuit's conclusion regarding the MET is equally applicable to the qualified plan trust, and merits quotation in full: "An issue in other cases has been whether

a multiple employer trust—the enterprise—is itself an employee welfare benefit plan. The courts, congressional committees, and the Secretary uniformly have held they are not." *Id.* at 1372. *Cf. Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.,* 805 F.2d 732, 738 (7th Cir.1986) ("The [plaintiff's] Plan is distinct from the [Retirement Life Reserve policy] trust [set up to accept premiums and purchase life insurance for plaintiff's plan], even though the [plaintiff's] Plan funds the benefits that it provides by the mechanism of the RLR trust.") (footnote omitted), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987).

The Court therefore concludes that the Qualified Corporate Plan Trust is not an ERISA plan. HTNB thus is not a named fiduciary under ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2).

2. Functional Fiduciary Status

A person may be a fiduciary, however, even if not named a fiduciary by an ERISA plan. The Department of Labor has taken the view—endorsed by the Seventh Circuit—that a person might become an ERISA fiduciary to the extent that he performs any functions enumerated in ERISA § 3(21). *See* 29 U.S.C. § 2509.75–8; *Forys v. United Food & Commercial Workers Int'l Union,* 829 F.2d 603, 606–07 (7th Cir. 1987). But it must be emphasized that this sort of functional fiduciary status does not make a person a fiduciary for all purposes; the person is a fiduciary only with respect to those functions enumerated in ERISA § 3(21) which he actually performs. *See Chicago Board Options Exchange, Inc. v. Connecticut General Life, Ins. Co.,* 713 F.2d 254, 259 (7th Cir.1983); *Brandt v. Grounds,* 687 F.2d 895, 896–98 (7th Cir. 1982).

Plaintiffs' theories of how HTNB assumed fiduciary status have tended to fluctuate throughout the many memorandums submitted to the Court. Having rejected plaintiffs' primary theory that the Qualified Corporate Plan Trust was an ERISA plan, the Court turns to what it views as their alternative arguments. In their Response to defendants' motions for summa-

ry judgment, plaintiffs assert that HTNB is a fiduciary because (1) it exercised control of the plan contributions; (2) it held the GAC, which is a plan asset; (3) it possessed the power to amend the GAC; and (4) by managing and administering the Qualified Corporate Plan Trust, it effectively managed and administered the AAP plans. Response, at 5–7.[7] Plaintiffs thus allege that HTNB performed (1) the fiduciary functions detailed in ERISA § 3(21)(A)(i), i.e., the exercise of authority or control over management of the plan or its assets; and (2) the functions detailed in ERISA § 3(21)(A)(iii), i.e., the exercise of discretionary authority or responsibility in plan administration.[8]

■ The § 3(21)(A)(iii) claim is disposed of most easily. To begin with, there is no evidence that HTNB performed the sort of functions typically encompassed by § 3(21)(A)(iii), such as granting or denying claims for benefits. *See Forys*, 829 F.2d at 605–07. Furthermore, to be a fiduciary under § 3(21)(A)(iii), the exercise of authority or responsibility in plan administration must be discretionary. HTNB's actions with respect to these plans, however, were circumscribed by the terms of the Qualified Corporate Plan Trust. The trust required HTNB to collect benefits and purchase group annuity contracts on behalf of subscribing applicants. There is no evidence that HTNB possessed or exercised any discretion with respect to these functions. Thus, even assuming (counterfactually) that HTNB had some sort of authority or control over the administration of the AAP plans within the meaning of § 3(21)(A)(iii), the authority or control was not discretionary. And whatever the case, there is no evidence that HTNB failed or refused to do anything it was required or expected to do with respect to the administration of the

AAP plans. Accordingly, the Court concludes that HTNB is not a fiduciary under the terms of § 3(21)(A)(iii), and even if it were, there is no evidence that it breached any fiduciary duty that could be imposed under that section of ERISA.

■ The Court turns to the requirements of § 3(21)(A)(i). That section sets up two potential grounds for liability: (1) the exercise of discretionary authority or control respecting plan management; and (2) the exercise of authority or control—without the qualification that this exercise be discretionary—over management or disposition of plan assets. The first of these grounds cannot support plaintiffs' case against HTNB. As the Court concluded above, the only ERISA plans involved in this case are the two plans that AAP established for its employees. The record before the Court gives no indication that HTNB had any authority or control over the management of these plans, let alone discretionary power over them.

Section 3(21)(A)(i)'s second ground of liability, however, cannot be dispatched with such ease. This part of the statute does not, by its terms, require discretionary authority of control respecting management or disposition of plan assets—the statute indicates that any sort of authority or control suffices. And HTNB certainly had possession of the plans' contributions and the group annuity contracts, both of which are "plan assets."

Nevertheless, it may well be argued that HTNB does not even exercise nondiscretionary authority or control over the plan assets. In Question D–2 of an interpretive bulletin published at 29 C.F.R. § 2509.75–8, Department of Labor concludes that a person who merely performs administrative functions pursuant to policies established

---

7. Later in this Response, when discussing theories of how HTNB and the other defendants breached their fiduciary duties, plaintiffs state that the theories of breach described in their brief are "[b]y way of illustration and not exclusion." Response, at 9. This will not do. Summary judgment is a procedure for weeding out claims that need not be tried. Once a plaintiff has been put to his proof by Rule 56, he cannot hold back argument which, if asserted, would

defeat the motion. *See Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir.1989) (district court under no duty to "scour" the record to find issues for the nonmoving party).

8. There is nothing to support a claim that HTNB rendered investment advice within the meaning of § 3(21)(A)(ii) and the Court does not understand plaintiffs to have so alleged.

by other parties "does not exercise any authority or control respecting management or disposition of the assets of the plan." *Cf. Robbins v. First American Bank of Virginia,* 514 F.Supp. 1183, 1189–91 (N.D.Ill.1981) (performance of "ministerial functions" under directions from another do not render an entity an ERISA fiduciary).

■ The Court agrees with the view of the labor department and the reasoning of *Robbins;* it concurs that a party such as HTNB, performing "ministerial functions" designated pursuant to a document like the Qualified Corporate Plan Trust, is not an ERISA fiduciary. A person does not exercise "authority or control" over a plan's assets if his actions are entirely directed by another. In this case, HTNB did what AAP's plans told it to do, as contemplated by the express terms of the Qualified Corporate Plan Trust: It collected contributions for the purchase of Home Life's FA by means of a group annuity contract and held the contract for the benefit of the plan participants.

The Court, however, does not rest its decision on this conclusion alone. Even assuming that HTNB's holding of the GAC and plan contributions made it a fiduciary pursuant to § 3(21)(A)(i), plaintiffs have not come up with evidence to support a finding that HTNB in fact breached any fiduciary duties.

Plaintiffs' primary theory of breach is that the negative float resulting from the flow-of-funds arrangement between Home Life and HTNB violated HTNB's obligation to use the plan contributions solely for the benefit of the plan participants. It is uncontested that the contributions sent to Home Life, which accepted them as HTNB's designated agent for the administration of the Qualified Corporate Plan Trust, earned interest under the FA from the time that Home Life received them and prior to the time that the checks cleared. UF 251. Similarly, it is uncontested that on the same day that Home Life received contributions it wire-transferred an equivalent amount of money to HTNB, which had interest-free use of the money for up to seven days, at which time the funds would be returned to "pay" the amount due under the FA. This arrangement was set up at Home Life's insistence in order to make the Qualified Corporate Plan Trust an "active," rather than a "passive," trust.

■ The same-day wire transfer of funds from Home Life to HTNB was not, in actuality, a use of plan assets for the benefit of HTNB, regardless of what the legal form used by Home Life and HTNB might have been. Although the negative float operated as an additional compensation to HTNB not mentioned in the documents, Home Life bore this cost itself, at least in terms of the contractual agreements between the parties. No doubt Home Life passed at least part (if not all) of this cost on to the plaintiffs in the form of a lower rate of return on the FA. But this relates to the question of Home Life's alleged failure to fully disclose the terms of the FA. It does not alter the fact that whatever plaintiffs contributed was immediately put out at interest under the FA, and they were charged directly no fees higher than those specified in the trust documents. The actual economic effect of the arrangement was that plaintiffs' funds were immediately invested with Home Life for the receipt of interest, and HTNB, in return for its services, received the interest-free use of an equal amount of Home Life's money.

Plaintiffs argue alternatively that this arrangement constitutes an illicit "sweep service," in which banks "sweep" idle cash balances of pension plans and other customers into short-term investments. The analogy is inapt; the funds were not idle; they were earning interest from Home Life.

Taking a different tack, plaintiffs argue that HTNB is a fiduciary because of its power to alter the terms of the GAC by agreement with Home Life. *See* PLX 29. But as HTNB points out, such changes would not be effective with respect to existing participants unless made in order to comply with changes in laws or regulations. *Id.* at 7. Consequently, HTNB had no discretionary power to amend the con-

tract with respect to parties already possessing interests in the GAC. In any case, the Seventh Circuit has made plain that "if [a contractholder] is a fiduciary because of the power to amend, this status only governs actions taken in regard to amending the contract and does not impose fiduciary obligations upon [the contractholder] more generally." *Chicago Board*, 713 F.2d at 259. Plaintiffs have identified no amendments to which HTNB agreed that affected their interests and constituted a breach of its fiduciary duties. The same holds true with respect to HTNB's power to amend the Qualified Corporate Plan Trust.

The plaintiffs' other arguments are of the make-weight variety. For example, they argue that HTNB violated its fiduciary duties by choosing Home Life as the trust administrator and failing to oversee its actions, and that HTNB failed to comply with the terms of the trust. The Court finds these arguments untenable both factually and legally.

Accordingly, the Court concludes that HTNB was not an ERISA fiduciary, and even if it were, it violated no fiduciary duties that plaintiffs have been able to identify.

### B. *Claims Against Home Life*

Plaintiffs argue that Home Life is a fiduciary under all three subsections of ERISA § 3(21)(A). Because plaintiffs' argument is most tenable respecting § 3(21)(A)(i), the Court will address this subsection first.

### 1. Applicable ERISA Provisions

At the outset, the Court observes that Home Life is not a fiduciary under the first prong of § 3(21)(A)(i), the exercise of discretionary authority or control over the management of an ERISA plan. The Court previously has rejected the argument that the Qualified Corporate Plan Trust was itself an ERISA plan that could subject Home Life and HTNB to ERISA fiduciary duties. Moreover, there is no evidence before the Court that Home Life possessed any discretionary authority or control over the management of the ERISA plans set up by AAP. In fact, there is no evidence that Home Life exercised *any* type of authority or control over these plans. Liability, if

any, can be grounded only upon the second prong of § 3(21)(A)(i), the "exercise[ ] [of] any authority or control respecting management or disposition of [plan] assets."

ERISA contemplates that a plan's investment in an equity interest of another entity can result in the plan's possession of two assets: The equity interest it has acquired, as well as a share of the underlying assets of the other entity. The underlying assets of the other entity then have a dual nature, because they in part constitute the assets of the investing plan and in part constitute the operating assets of the other entity. In turn, the entity's power over these assets could then render it an ERISA fiduciary, because the entity "exercises ... authority or control respecting management or disposition of [plan] assets." § 3(21)(A)(i). *See Peoria Union Stock Yards Co. v. Penn Mutual Life Ins. Co.*, 698 F.2d 320, 326–27 (7th Cir.1983).

The drafters of ERISA recognized this implication of the statute's design, and enacted § 401(b), 29 U.S.C. § 1101(b). Section 401(b)(1) provides that a plan's investment in a security issued by an investment company registered under the Investment Company Act of 1940, 15 U.S.C. § 80a–1 *et seq.*, does not give the plan an interest in the underlying assets of the investment company. Section 401(b)(2) creates an additional exclusion that is relevant here:

> In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer. For purposes of this paragraph:
>
> (A) The term "insurer" means an insurance company, insurance service, or insurance organization, qualified to do business in a State.
>
> (B) The term "guaranteed benefit policy" means an insurance policy or contract to the extent that such policy or contract provides for benefits the amount of which is guaranteed by the insurer. Such term includes any surplus

in a separate account, but excludes any other portion of a separate account.

Home Life seeks refuge in § 401(b)(2), arguing that both the FA and the PSWL are guaranteed benefit policies. Noting the reference in § 401(b)(2)(B) to separate accounts, Home Life contends that "guaranteed benefit" policies are those (like the GAC and PSWL) in which the premiums and contributions are invested in an insurer's general account. Home Life claims additional support for this argument in a labor department interpretive bulletin. *See* 29 C.F.R. § 2509.75–2.

Plaintiffs, cross-moving for summary judgment, argue that the FA cannot be a guaranteed benefit policy because of its excess interest feature. This feature, they assert, means at least part of the benefits promised under the FA are not guaranteed in advance, a conclusion they believe dictated by the terms of the statute and the legislative history of the enactment. *See* Joint Explanatory Statement of the Conference Committee, H.R. No. 1280, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin. News 4639, 5038, 5077. Plaintiffs further contend that the FA cannot be a guaranteed benefit policy under the Seventh Circuit's decisions in *Peoria Union* and *Chicago Board, supra.* They also rely heavily on *Jacobson v. John Hancock Mutual Life Ins. Co.*, 662 F.Supp. 1103 (D.Conn.1987).

### 2. Labor Department Views

Finding the statute, legislative history and cases far less pellucid than the parties purport to find them, the Court turns to the views of the Department of Labor, entrusted with enforcement of the statute, see 29 U.S.C. § 1135, and whose regulations and rulings are entitled to deference unless clearly inconsistent with the law. *See Amato v. Western Union Int'l, Inc.*, 773 F.2d 1402, 1411–12 (2d Cir.1985), *cert. dismissed*, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986). The labor department has promulgated a regulation partly defining the term "plan assets," 29 C.F.R. § 2510.3–101, which became effective on March 13, 1987. The policy animating Reg. § 2510.3–101 is to impose ERISA fiduciary

obligations upon persons or entities that, practically speaking, have been entrusted with the management and investment of plan assets. The regulation thus "looks through" the form of an entity to hold it directly liable as a fiduciary with respect to plan assets that have ostensibly been used to purchase an equity interest in that enterprise. The department explained:

> [T]here are many situations where a plan, although nominally investing its assets in a separate entity, is as a practical matter retaining the persons who manage the entity to provide investment management services for the plan. For example, some institutional managers— such as banks and insurance companies—have traditionally pooled the assets of several plans for purposes of collective investment, and plans typically participate in such a fund by acquiring investment units evidencing an interest in the fund. More recently, limited partnerships have been used as devices for the collective investment of plan assets.

Final Regulation Relating to Definition of Plan Assets, 51 Fed.Reg. 41,262 (1986).

The regulation therefore provides:

> Generally, when a plan invests in another entity, the plan's assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity. However, in the case of a plan's investment in an equity interest of an entity that is neither a publicly-offered security nor a security issued by an investment company registered under the Investment Company Act of 1940 its assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established that—
>
> > (i) The entity is an operating company, or
> >
> > (ii) Equity participation in the entity by benefit plan investors is not significant.
>
> Therefore, any person who exercises authority or control respecting the management or disposition of such underlying assets, and any person who provides investment advice with respect to such as-

sets for a fee (direct or indirect), is a fiduciary of the investing plan.

Reg. § 2510.3–101(a)(2).

In that curious way of putting things that is so common to federal regulations, Reg. § 2510.3–101(a)(2) states as its general rule that an ERISA plan's investment in an entity does not transform the entity's assets into plan assets. It then significantly narrows this "general" rule by providing that investment in an equity interest gives a plan an interest in the entity's underlying assets, unless (1) the equity interest is a security issued by an investment company registered under the Investment Company Act of 1940 (see ERISA § 401(b)(1)); (2) the equity interest is a publicly offered security; (3) the issuer is an "operating company" (see Reg. § 2510.3–101(c)); or (4) benefit plan investors do not "significantly participate" in the equity ownership of the entity (see Reg. § 2510.3–101(f)). The general rule thus holds true for investment in the form of debt, for example, but not for equity interests that fall outside the four listed categories.

Regulation § 2510.3–101(b)(1) goes on to define equity interest as:

> [A]ny interest in an entity other than an instrument that is treated as indebtedness under applicable local law and which has no substantial equity features. A profits interest in a partnership, an undivided ownership interest in property and a beneficial interest in a trust are equity interests.

And Reg. § 2510.3–101(h) specifies that the acquisition of certain interests always carries with it a share of the entity's assets:

> (1) Except where the entity is an investment company registered under the Investment Company Act of 1940, when a plan acquires or holds an interest in any of the following entities, its assets include its investment and an undivided interest in each of the underlying assets of the entity:
>
> . . . . .
>
> (iii) A separate account of an insurance company, other than a separate account that is maintained solely in connection with fixed contractual obligations of the insurance company under which the amounts payable, or credited, to the plan and to any participant or beneficiary of the plan (including an annuitant) are not affected in any manner by the investment performance of the separate account.
>
> (2) When a plan acquires or holds an interest in any entity (other than an insurance company licensed to do business in a State) which is established or maintained for the purpose of offering or providing any benefit described in section 3(1) or section 3(2) of the Act to participants or beneficiaries of the investing plan, its assets will include its investment and an undivided interest in the underlying assets of that entity.

Despite its discussion of insurance company separate accounts, the regulation does not discuss the proper treatment of contributions held in insurers' general accounts.

Rather than defend the FA under the terms of Reg. § 2510.3–101, Home Life instead seeks to rely upon Department of Labor Interpretive Bulletin 75–2, 29 C.F.R. § 2509.75–2. Home Life accurately quotes I.B. 75–2(b) for the following proposition: "If an insurance company issues a contract or policy of insurance to a plan and places the consideration for such contract or policy in its general asset account, the assets in such account shall not be considered to be plan assets." Noting further (and again accurately) that this portion of I.B. 75–2(b) survived the labor department's promulgation of Reg. § 2510.3–101, Home Life concludes: "[I]f in regulating plan assets, the Department made no mention of insurance company general account contracts, and specifically left intact paragraph (b) of I.B. 75–2, the Department did so because, in its view, general account contracts such as the FA and PSWL do not give an insurer control of plan assets." Response to Cross–Motion, at 10.

This argument, however, misconstrues the reason why the labor department left I.B. 75–2(b) intact. The interpretive bulle-

tin deals not with the definition of plan assets for all purposes, but rather with the definition of plan assets for purposes of the "prohibited transactions" provisions of ERISA § 406, 29 U.S.C. § 1106, which forbids specified transactions between plans, fiduciaries and "parties in interest." This is made plain by examining the sentence immediately following the sentence in I.B. 75–2(b) quoted by Home Life: "Therefore, a subsequent transaction involving the general asset account between a party in interest and the insurance company will not, solely because the plan has been issued such a contract or policy of insurance, be a prohibited transaction." It is for that reason the preamble of I.B. 75–2(b) notes that paragraph (b) "relate[s] to matters outside the scope of § 2510.3–101."

It seems perfectly consistent to this Court that plan assets might be considered such for purposes of general fiduciary duties, but not for purposes of the prohibited transactions rules. For example, without the policy stated in the bulletin, independent investment transactions between an insurer and large corporate employers who had purchased the insurer's general account products through a multiemployer plan could be deemed unlawful under § 406—even though there would be little, if any, chance that one employer could influence the insurer's investment decisions. *See* Statement of Paul J. Fasser, Jr., Assistant Secretary of Labor, quoted in *Jacobson,* 662 F.Supp. at 1109–10. Nevertheless, it could still be sound statutory policy to subject the insurer to fiduciary duties more generally, while exempting it from the per se conflict-of-interest prohibitions of § 406.

The Court thus returns to Reg. § 2510.3–101. Although the regulation

was adopted long after the plaintiffs made their contributions under the FA, it was intended to cover assets already in existence, and neither side has argued that the contributions here are exempt under the regulation's transitional rule, § 2510.3–101(k).[9] Therefore, even though the parties (particularly plaintiffs) have essentially ignored the import of this regulation, the Court concludes that Reg. § 2510.3–101 is a persuasive explanation of the statute's meaning.

 The initial difficulty is the regulation's failure to discuss the fiduciary consequences of general account insurance contracts. Home Life argues that the regulation does not address general account contracts because the labor department understood them to be guaranteed benefit policies directly insulated from ERISA fiduciary status by § 401. The Court does not believe this conclusion ineluctable, for the failure to discuss general account contracts could as easily reflect reservation of judgment pending further study. With a statute as complicated as ERISA, it is often too glib to conclude that there will be a perfect fit between all of the statutory provisions and regulations. And the Court remains unconvinced that the use of general accounts is sufficient in itself to insulate an insurer from ERISA fiduciary duties. Nevertheless, after considering the terms of § 401, Reg. § 2510.3–101, the cases, and the legislative and regulatory history, the Court is convinced that Home Life's receipt of contributions under the FA does not make it an ERISA fiduciary.

The Court's starting point is the general rule stated in Reg. § 2510.3–101(a)(2), i.e., a plan's acquisition of a non-equity interest in an entity will not give the plan a share of the entity's underlying assets. This classi-

---

**9.** In order for the regulation to be inapplicable to an entity's existing assets, no plan could acquire an interest in the entity following the regulation's March 13, 1987, effective date, unless the acquisition was pursuant to a pre-existing contract. Reg. § 2510.3–101(k); 51 Fed. Reg. at 41,277–78. The labor department thought retroactivity necessary in order to avoid the delay in implementing the regulation that would result from the long-term nature of many ERISA-plan investments and to ensure that sim-

ilarly situated investors would be treated the same, regardless of when their investment was made. 51 Fed.Reg. at 41,277. In any event, the regulation is always available as a defense under the transition rule. And even were the regulation for some reason deemed not effective with respect to the contracts here, the Court believes the regulation is an accurate construction of the law providing sound guidelines for analysis of the issues before the Court.

1186

fication is to be made with reference to state law. Reg. § 2510.3–101(b)(1); 51 Fed.Reg. at 41,265–66. As Home Life has pointed out repeatedly in its briefs to this Court, Home Life is a mutual insurance company incorporated in New York, and the FA is a type of "participating" insurance contract under which contributions are deposited in the company's general account. By law (see N.Y. Insurance Law § 4231),[10] each participating contract is entitled to share equitably each year in the company's "divisible surplus," which is the net amount that results when the insurer's investment, expense and mortality results are more favorable than the assumptions the insurer used in setting rates. New York has classified the relationship between mutual insurers and holders of traditional life insurance policies as one of debtor-creditor. *See Fidelity and Casualty Co. of New York v. Metropolitan Life Ins. Co.*, 42 Misc.2d 616, 248 N.Y.S.2d 559, 565 (1963); *Clifford v. Metropolitan Life Ins. Co.*, 264 A.D. 168, 34 N.Y.S.2d 693, 695 (1942). While the distribution from divisible surplus is termed a "dividend," New York views the distribution not as a share of profits, but rather as a reduction in the premium paid. *Methodist Hospital of Brooklyn v. State Ins. Fund*, 64 N.Y.2d 365, 486 N.Y.S.2d 905, 909, 476 N.E.2d 304, 308 (Ct. App.), *appeal dismissed*, 474 U.S. 801, 106 S.Ct. 32, 88 L.Ed.2d 26 (1985); *Kern v. John Hancock Mutual Life Ins. Co.*, 8 A.D.2d 256, 186 N.Y.S.2d 992, 996–97 (1959), *aff'd without opinion*, 8 N.Y.2d 833, 203 N.Y.S.2d 92, 168 N.E.2d 532 (Ct. App.1960).

Thus, a plan's possession of an ordinary participating insurance contract, such as the PSWL, would be viewed as giving it a debt interest in the insurer under New York law, and Reg. § 2510.3–101(a)(2) consequently would exempt the insurer from ERISA fiduciary duties. Like an ordinary participating policy, the FA guarantees the amount of contributions and any interest credited on the policy beneficiary's account. With regard to interest, the FA equates the amount of interest paid in excess of the guaranteed rates with the contract contributor's share of Home Life's divisible surplus. Group Annuity Contract, at 5, PLX 29. The question then is whether the variable interest feature of the FA transforms the contract into an equity instrument and makes the insurer a fiduciary under Reg. § 2510.3–101(a)(2). The Court believes it does not.

In the Court's view, the critical fact about the FA is not that it is a general account contract (though this fact is important, see Reg. § 2510.3–101(h)(1)(iii)), but that the principal amount of contributions and credited interest was guaranteed and that the excess interest rate was at all times declared in advance of payment and for a specified period. Although the excess rate could be altered on past contributions (and accumulated interest) from year to year, the currently declared excess rate always represented a fixed contractual obligation of Home Life to the policy beneficiaries. A participant dissatisfied with the currently declared rates was always free to withdraw, receiving back what he had contributed, less a reduction in cash value for withdrawal during the first four years of the contract.[11] While this cash value reduction made early withdrawal unattractive, it is not materially different than the early withdrawal penalties found in other types of long-term debt instruments, such as certificates of deposit.

**10.** It may well be that Rhode Island law governs the obligations under the FA. The Court, however, has been unable to locate Rhode Island cases dealing with the points addressed here. But given that the principles of New York law are those generally prevailing in the United States, see Couch Cyclopedia of Insurance Law § 34:118–113 (2d ed. 1985), the Court assumes that the analysis would be the same under Rhode Island law.

**11.** This reduction in cash value varied according to the age of the participant, but the lowest the cash value could be was 92.5% of contributions and credited interest in the first year of participation. The percentage gradually increased until no later than the fifth year, when the entire amount of contributions could be withdrawn without adjustment. PLX 29, at 3. Home Life also had the option of delaying payment of the cash value for up to six months after a written request had been received. *Id.*, at 7.

Furthermore, the Court does not believe that the FA permitted the sort of de facto investment management that the look-through rule was designed to ferret out and subject to fiduciary duties. The critical inquiry here is to determine which party bears the risk of loss on the contributions made under the contract. In the case of the FA, which guarantees the principal amount of contributions, that party is Home Life. In the case of the collective investment funds which the regulation is designed to reach, the party bearing the investment risk would be the investing plan, which would not receive a guarantee of the principal contributed. This is implicit in the regulation's extension of ERISA fiduciary obligations to the non-exempt forms of equity interests, since the nature of equity is exposure of the investor's contribution to the risks of the enterprise (and thus the possibility of loss).

To be sure, by purchasing the FA the plaintiffs in effect staked the amount of their potential return on Home Life's investment experience. Home Life invested the funds it received and passed on part of its return to the FA purchasers, thus permitting plaintiffs to indirectly retain Home Life to manage their funds. But the Court does not consider this arrangement the sort of de facto retention of an investment manager that the look-through regulation and ERISA seek to control. The Court believes that there must instead be a direct connection between the investment results achieved by the party to whom the funds are entrusted and the return of principal and interest to the investing plan.

The Court returns once more to the fact that the principal and credited interest were guaranteed, and the excess rates of interest declared in advance. Regardless of Home Life's actual investment results, plaintiffs' return could be determined at any time during the contract's life. Plaintiffs make much of Home Life's use of long-term investments giving the company certain knowledge of most of the investment return to be expected in the coming year; in fact, plaintiffs argue (and the Court will accept as true on these cross-motions for summary judgment) that since

less than 7% of Home Life's assets turned over each year, the company knew the return it could expect on nearly 94% of its general account investment. Nevertheless, this does not alter the fact that once declared, the excess rate imposed a binding obligation on Home Life that was not directly related to its investment success in the year to come. Plaintiffs may have made a bad bargain, but it does not follow that Home Life thereby became an ERISA fiduciary.

The related provisions of Reg. § 2510.3–101 support this conclusion as well. For example, Reg. § 2510.3–101(h) establishes per se rules of fiduciary responsibility attending certain transactions and relationships. One of these per se rules is found in Reg. § 2510.3–101(h)(2), providing that entities set up to facilitate the provision of benefits to plan participants become ERISA fiduciaries when they accept plan contributions. However, this subsection specifically exempts insurance companies from the per se rule. At the same time, Reg. § 2510.3–101(h)(1)(iii) provides that insurance company separate accounts make the insurer an ERISA fiduciary, unless the account "is maintained solely in connection with fixed contractual obligations of the insurance company under which the amounts payable, or credited ... are not affected in any manner by the investment performance of the separate account."

These subsections do not say that the deposit of contributions to an insurer's general account exempt it from ERISA fiduciary obligations. They do, however, reflect a reticence to subject insurers to ERISA duties, even in circumstances where other entities would be so subjected. *See* § 2510.3–101(h)(2). Furthermore, while the statute appears to deem fiduciary duties as automatically arising from the use of the separate accounts, *see* ERISA § 401(b)(2)(B), the regulation narrows this liability by exempting special accounts maintained in connection with fixed obligations unaffected by the investment performance of the separate account, *see* Reg. § 2510.3–101(h)(1)(iii). As the Court has explained already, the obligations under

the FA were always fixed, in the sense that at any time, a plan participant knew precisely the amount of interest and principal to which he was entitled.

To the extent that the regulatory history speaks to this point, it also supports the Court's view. In adopting Reg. § 2510.3–101, the labor department explained that the exclusion for debt interests "reflected a determination that only those investments which provide a plan with an opportunity to share in the success or failure of the entity to which the investment relates are likely to be vehicles for the indirect provision of management investment services." 51 Fed.Reg. at 41,263. As discussed above, contributors to the FA did not share in the success or failure of Home Life, since principal and accumulated interest were guaranteed, and excess interest was always declared in advance of actual investment performance.

In addition, the labor department did not intend for fiduciary status to arise from every contract with some element of equity participation, such as variable interest. The department noted: "[W]hile the question whether a plan's interest is an 'equity interest' is an inherently factual one, an instrument will not fail to be a debt instrument merely because it has certain equity features—such as additional variable interest and conversion rights—that are incidental to the primary fixed obligation." *Id.* at 41,265. Under the FA, where interest rates were declared in advance, the primary obligation of Home Life was always fixed. The Court believes the reference to "additional variable interest" means interest declared after investment results are in, i.e., at the end of the policy year. If even contracts with some equity participation features could escape ERISA fiduciary obligations under the regulation, then debt instruments like the FA should escape fiduciary status as well.

Both sides spill much ink over the meaning of ERISA § 401(b)(2). Obviously, a statutory provision is controlling. But given that the agency entrusted with administration of this complicated statutory scheme has carefully considered the scope of the statute and issued a regulation on point in accordance with the statute, the Court believes in this case that the regulation is persuasive as to the meaning of the statute.

Apart from the regulation, the Court has examined the statute, the legislative history and the cases interpreting it, and concludes that the statute does exempt the FA and PSWL from ERISA fiduciary duties.

### 3. Construction of § 401

The Court, of course, begins with the statute's terms. Section 401(b)(2) exempts from fiduciary duties contributions made to insurers under "guaranteed benefit policies." A policy is a "guaranteed benefit policy" under the statute "to the extent that such policy or contract provides for benefits the amount of which is guaranteed by the insurer." § 401(b)(2)(B). However, funds deposited to separate accounts are deemed to create fiduciary duties on the insurer's part. *Id. But cf.* Reg. § 2510.3–101(h)(2) (narrowing the application of § 401(b)(2)(B) with respect to separate accounts).

Plaintiffs cite a portion of the legislative history discussing § 401(b)(2) and conclude that it requires treatment of Home Life as an ERISA fiduciary. The portion reads:

> An insurance company also is not considered to hold plan assets if a plan purchases an insurance policy from it, to the extent that the policy provides payments guaranteed by the company. If the policy guarantees basic payments but other payments may vary with, *e.g.*, investment performance, then the variable part of the policy and assets attributable thereto are not to be considered as guaranteed, and are to be considered as plan assets subject to the fiduciary rules.

Joint Explanatory Statement of the Conference Committee, H.R. No. 1280, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin. News 4639, 5038, 5077.

As this opinion indicated above, the Court does not consider the FA as providing benefits varying with investment performance. The variable interest on the FA, though based upon expected investment return, was always declared in advance, and

thus an independent contractual obligation of Home Life. Because of this advance declaration of the excess interest rate, the value of a participant's account and the interest to which it was currently entitled could always be ascertained with certainty.

The key to plaintiffs' argument is *Peoria Union*, 698 F.2d 320, which they vigorously assert requires the Court to find in their favor. Aside from the distinguishable factual pattern of *Peoria Union*, it is of less force than plaintiffs think for three entirely different reasons. As an initial matter, *Peoria Union* was decided upon a motion to dismiss, rather than summary judgment, and thus required the court of appeals to reverse if plaintiffs in that case could recover on any conceivable set of facts. The case therefore was not decided upon a complete record.

Furthermore, like any case, the outcome in *Peoria Union* was in large part determined by the parties' arguments and citation of authority. Following the decision in *Peoria Union*, defendant retained new counsel to seek rehearing based upon a supplemental memorandum containing new arguments and authorities. Though the petition was denied, the court of appeals indicated that further development of the record in the district court might negate ERISA fiduciary status. *See id.* at 328. The denial specifically approved presentation of these new arguments and authorities to the district court. *Id.* ("[A]ppellee will have ample opportunity to present its arguments to the district court consistently with the flexible contours of the doctrine of law of the case."). The case, however, was settled before further opinions were issued.

Finally, *Peoria Union*, a 1983 decision, was handed down before the labor department had fully developed the views that were eventually crystallized in Reg. § 2510.3–101, which was first proposed on January 8, 1985. The court of appeals thus decided the case without the full benefit of the administrative agency's opinion of the statute's scope. The law of ERISA has developed more fully since the Seventh Circuit decided the case.

All of the foregoing is not to question *Peoria Union*'s status as good law, and this Court's duty to apply it to similar circumstances. *See Rodriquez de Quijas v. Shearson/American Express, Inc.,* — U.S. ——, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989); *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.,* 881 F.2d 1396, 1405 (7th Cir.1989). It is merely to illustrate some of the reasons why *Peoria Union* is not on point. As the Court will now discuss, the facts of *Peoria Union* are distinguishable from this case, and thus it does not control the result here.

*Peoria Union* involved contributions to a variable-interest group annuity contract issued by the Penn Mutual Life Insurance Co. to a salaried-employee pension plan. The opinion indicates that contributions under the contract were deposited in Penn Mutual's general account, see *Peoria Union*, 698 F.2d at 322 ("[T]he funds in the account are commingled for investment purposes with the funds of other customers of the insurance company."), and this fact appears to be confirmed by the affidavit of one of the attorneys for the plaintiffs in the *Peoria Union* case, see Rhodes Aff., PLX 923. Unlike Home Life's FA, however, the Penn Mutual contract provided for no interest guarantees on contributions made after the third year of the contract's life. *Peoria Union*, 698 F.2d at 322. Furthermore, the rate of the variable interest was to be declared at the end of the contract year, rather than at the start. Penn Mutual Contract, at 5, PLX 923. The amount of the variable interest was equated with the contract's share of Penn Mutual's divisible surplus. *Peoria Union*, 698 F.2d at 322. The principal amount of contributions and credited interest were at all times guaranteed. Penn Mutual Contract, at 17, PLX 923.

In holding that this contract created fiduciary duties on the part of Penn Mutual, the court of appeals likened contributions under the contract to investment in a mutual fund, 698 F.2d at 325, and explained: "If the pension plan had hired an investment advisor and given him authority to buy and sell securities at his discretion for the plan's account, the advisor would be a fidu-

ciary within the meaning of the act, and that is essentially what the trustees did during the accumulation phase of the contract with Penn Mutual." *Id.* at 327. The court rejected Penn Mutual's § 401(b)(2) defense, stating that the statute was designed to exempt from ERISA fiduciary duties "standard annuity contract[s]." *Id.*

The Penn Mutual contract indeed was much like the sort of surrogate hiring of an investment advisor targeted by ERISA and Reg. § 2510.3–101. The declaration of interest at the end of the contract year always allowed Penn Mutual to tie the interest it paid directly to its actual investment results. Moreover, the declaration at the end of the year meant that plaintiffs' funds were entrusted to Penn Mutual before the ultimate result was known—similar to an arrangement with an independent investment advisor (though, as Home Life has pointed out, the analogy to a mutual fund is inexact, since principal in mutual funds is not guaranteed).

The court of appeals itself recognized the importance of the timing of interest payments in *Chicago Board,* 713 F.2d 254, which concerned a claim of fiduciary liability under ERISA § 3(21)(A)(i). The plaintiffs in *Chicago Board* claimed that an insurer paying below-market interest rates on an general account annuity contract exercised its power to amend the contract so as to lock in contributions already made under the contract for up to ten years. *Id.* at 256. The contract "guaranteed the amount of interest to be paid in advance, although the rate of return could be changed [by the insurer] 'from time to time.'" *Id.* In holding that the insurer was an ERISA fiduciary with respect to the amendment of the contract, the court reasoned that the amendment, by locking in pension-plan contributions, effectively dictated plan investment decisions. *Id.* at 260. But the Court rejected a broader theory of fiduciary duty, distinguishing *Peoria Union* as follows:

> Had CBOE simply given Plan assets to Connecticut General and said, "Invest this as you see fit and we will use the proceeds to pay retirement benefits," Connecticut General would clearly have

sufficient control over the disposition of Plan assets and be a fiduciary under ERISA.... Because Connecticut General guaranteed the rate of return in advance for the Guaranteed Accounts, that is not the case here.

*Id.* (citation to *Peoria Union* omitted).

Given the Seventh Circuit's reasoning in *Chicago Board,* this Court is convinced that precedent does not require a finding of ERISA fiduciary liability. If anything, *Chicago Board* indicates that an insurer's declaration of interest in advance, even coupled with the right to adjust the rates during the life of the contract, insulates the insurer from fiduciary status under § 3(21)(A)(i). As for *Peoria Union*'s suggestion that § 401(b)(2) protects only traditional contracts, *Chicago Board* makes clear that the statement was only dicta.

Finally, plaintiff relies on the district court's opinion in *Jacobson,* 662 F.Supp. 1103. But as Home Life points out, the *Jacobson* decision is not persuasive. Although the district court in *Jacobson* originally concluded that contributions to a general account contract providing for variable interest made the insurer a fiduciary, the opinion was withdrawn as part of the parties' settlement of the lawsuit. In withdrawing the opinion, the court noted: "[T]he Court, upon consideration of matters set forth in defendant's brief submitted in support of its motion [for interlocutory appeal] finds that there are genuine issues with respect to whether, in enacting ERISA, Congress intended that insurance companies be deemed to be fiduciaries, as defined by ERISA, with respect to assets contributed pursuant to group annuity contracts and held in their general investment accounts." *Id.* at 1113.

The facts of *Jacobson* were in any event distinguishable, since the contract at issue permitted the insurer to determine the amount to be credited to the contributors' account after the results of its investment strategies were known. *See id.* at 1105 ("[T]he return on the [contract], however, depended entirely on the investment performance of defendant's [general ac-

count].... The [contributors'] accounts were adjusted annually to reflect the net investment experience minus expenses and taxes."). *See also id.* at 1108 ("[U]nlike the guaranteed annuity contract, benefits of any or all participants are not guaranteed under GAC 738 so long as the fund contributions are subject to the investment results achieved by the insurer.").

### 4. Plaintiffs' Other Theories

■ Having rejected the argument that the sale of the FA and PSWL made Home Life an ERISA fiduciary to the AAP plans, the Court turns briefly to plaintiffs' two remaining theories of fiduciary duty. Under the first of these theories, plaintiffs assert (without citation to case authority) that Home Life is a fiduciary under ERISA § 3(21)(A)(ii) because it rendered investment advice for a fee. The labor department has refined the investment advice test in Reg. 2510.3–101(c), which the Seventh Circuit applied in *Farm King Supply, Inc. v. Edward D. Jones & Co.*, 884 F.2d 288, 291–94 (7th Cir.1989). To hold a person liable for rendering investment advice, a plaintiff must show not only that the person in fact rendered investment advice, but also that he either (1) had discretionary authority or control with respect to selling or buying securities or other property of the plan, or (2) he rendered advice to the plan on a regular basis pursuant to an agreement under which the person was to give the plan individualized investment advice to be used as the primary basis for plan investment decisions. As the Court has explained above, Home Life did not have discretionary control to buy or sell the assets of the AAP plans. Nor does the Court believe that Home Life was hired to render the sort of individualized investment advice contemplated by the regulation; all Home Life did was talk the plans into buying its insurance products as a means of funding retirement benefits for AAP employees. *Cf. Farm King*, 884 F.2d at 294 (" '[s]imply urging the purchase of its products does not make an insurance company an ERISA fiduciary with respect to those

products.' ") (quoting *American Federation of Unions v. Equitable Life Assurance Society*, 841 F.2d 658, 664 (5th Cir. 1988)).

■ The plaintiffs' second theory is also unavailing. Plaintiffs assert (again without citation to case authority) that Home Life possessed discretionary authority or responsibility in the administration of the AAP plans, thereby becoming a fiduciary under ERISA § 3(21)(A)(iii). But there is no evidence that Home Life performed discretionary duties with respect to the administration of AAP plans (*cf. Forys v. United Food & Commercial Workers Int'l Union*, 829 F.2d 603, 606–07 (7th Cir.1987)); nor can the Court accept plaintiffs' theory that Home Life's design of the prototype plan which AAP adopted constitutes the sort of discretionary authority contemplated by § 3(21)(A)(iii).[12] In any event, plaintiffs have failed to put forward evidence that Home Life breached any conceivable duties regarding plan administration.

The Court thus holds that Home Life is not an ERISA fiduciary.

### C. *Kranke, Levenfeld and Canapary Defendants*

The Court also concludes that the remaining defendants are entitled to summary judgment on plaintiffs' ERISA claims. All of these defendants have carried their initial burden of pointing out to the Court an absence of evidence in the record to support plaintiffs' allegations that they were functional fiduciaries pursuant to ERISA § 3(21)(A). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In response, plaintiffs have not drawn the Court's attention to contrary evidence creating genuine factual disputes. Summary judgment is appropriately granted in these circumstances. *See Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983).

---

**12.** Plaintiffs' claim against Home Life under § 3(21)(A)(iii) is premised at least in part on respondeat superior liability for the actions of its agents, Canapary and Aure. This theory fails as well, for as the Court will explain below, Canapary and Aure are not ERISA fiduciaries.

The nature of plaintiffs' response to these summary judgment motions calls for additional comment. Plaintiffs have in large part attempted to show the existence of factual disputes by citing to the Statement of Contested Facts in the Final Pretrial Order. But as the defendants have strenuously objected, the inclusion of a matter in the Statement of Contested Facts does not mean that a factual dispute concerning the proposition actually exists; it merely means that the parties cannot agree to the proposition's truth or falsity. To the extent that plaintiffs have responded to these motions by citing to the Statement of Contested Facts, rather than to evidentiary exhibits, they have failed to meet their burden under Rule 56. *Posey*, 702 F.2d at 105 ("[A] bare contention that an issue of fact exists is insufficient to raise a factual issue.").

### 1. Kranke and Levenfeld Defendants

■ All of the evidence before this Court indicates that the Kranke and Levenfeld defendants did nothing more than render professional services in connection with AAP's pension plan decisions. The Kranke defendants performed actuarial calculations and completed tax-reporting forms, and the Levenfeld defendants gave legal advice. Accordingly, none of these defendants is an ERISA fiduciary. *See* Interpretive Bulletin 75–5, 29 C.F.R. § 2509.75–5; *Yeseta v. Baima*, 837 F.2d 380, 385 (9th Cir.1988) (adopting view of I.B. 75–5); *Nieto v. Ecker*, 845 F.2d 868, 870–71 (9th Cir. 1988) (following *Yeseta* ). *Cf. Robbins v. First American Bank of Virginia*, 514 F.Supp. 1183 (N.D.Ill.1981) (performance of "purely ministerial" functions does not give rise to ERISA fiduciary duties); I.B. 75–8 question 2, 29 C.F.R. § 2509.75–8 (performing administrative functions pursuant to another's direction does not result in ERISA fiduciary status).

In I.B. 75–5, the labor department opined that "attorneys, accountants, actuaries and consultants performing their usual professional functions will ordinarily not be considered fiduciaries," provided that they do not undertake the tasks spelled out in ERISA § 3(21)(A)(i)-(iii). The Ninth Circuit

has given this regulation the following gloss: "[A person] rendering professional services to a plan is not a fiduciary so long as he does not exercise any authority over the plan 'in a manner other than by usual professional functions.'" *Nieto*, 845 F.2d at 870 (quoting *Yeseta*, 837 F.2d at 385).

In their motions for summary judgment, both the Kranke defendants and the Levenfeld defendants have cited to deposition testimony and documentary evidence showing that they did nothing other than render professional services in connection with Schwarz's decision to pursue additional pension plan options. Their sole compensation was in the form of fees for their services. *See, e.g.*, UF 36–37, 44, 46, 65–68, 72–74, 77–81, 103; Kranke Dep., Kranke MSJ Ex. A; Schwarz Dep., at 1801, 2026, 2129–34, 1947–48, 2042–43, Kranke MSJ Ex. C, Levenfeld MSJ Ex. A. Plaintiffs' response, relying largely on the Statement of Contested Facts, fails to put forward evidence that either group of defendants had authority or control over the management of the AAP plans or plan assets, rendered investment advice for a fee, or exercised discretionary authority over administration of the plans.

There is no evidence to go to a jury on these points. The Court therefore holds that neither the Kranke defendants nor the Levenfeld defendants are ERISA fiduciaries.

### 2. Canapary Defendants

■ Plaintiffs have similarly failed to meet the burden of production which the Canapary defendants placed upon them by bringing a properly supported motion for summary judgment. The Canapary defendants put forward extensive evidence concerning their relationship to Schwarz and AAP. This evidence indicates that the Canapary defendants did nothing more than sell Schwarz and AAP on the purported advantages of Home Life's products (including the use of the prototype plan) and then performed the sort of follow-through services (gathering information and processing applications, accounting for contributions, preparation of account statements and tax information, answering questions,

and so forth) on which such sales depend. *See, e.g.*, UF 48, 50–56, 69, 72, 74, 84, 88, 108; Canapary Dep., at 695–96, Canapary MSJ Ex. D; Aure Dep., at 93–94, 109–15, Canapary MSJ Ex. E; Schwarz Dep., at 784–90, Canapary MSJ Ex. A.

Again, plaintiffs have largely responded with citations to the Statement of Uncontested Facts. For instance, to support their claim that AAP turned over to the Canapary defendants administration and management of its pension plans, plaintiffs cite Contested Facts 34, 49–51, 53–54, 64, 159, 180, 306, 314–15, but no underlying evidence to support these assertions. When plaintiffs have cited evidence, they have tended to cite facts which, insofar as they are pertinent, are relevant only to the question of *breach* of fiduciary duty, but not to the question whether a fiduciary duty existed in the first place. For example, UF 59, 92, 94, 97, 99, 100, 105, 199, 142, 261, 264, 319, 340.

The closest plaintiffs have come to citing factual material that could create a genuine dispute is their reference to portions of the deposition testimony of Schwarz, who recalled that the Canapary defendants had held meetings to answer questions from Home Life employees, "since the Home Life was totally handling the pension of the company." Schwarz Dep., at 1255, Plaintiffs' MSJ Ex.K. But this conclusory statement alone is insufficient to create a genuine dispute of material fact in the face of the overwhelming evidence to the contrary. For that matter, it is not clearly inconsistent with the evidence that the Canapary defendants merely performed follow-up services to the sale of the Home Life products.

In short, there is no evidence from which a jury could conclude that the Canapary defendants exercised control over the management of the plan or its assets, or that these defendants exercised discretionary authority or responsibility in plan ad-

ministration. *See* ERISA § 3(21)(A)(i), (iii). Similarly, there is no jury question concerning whether the Canapary defendants had been retained as investment advisors to the AAP plans. *See* ERISA § 3(21)(A)(ii); Reg. § 2510.3–21(c); *Farm King*, 884 F.2d at 293–94. The Canapary defendants are not ERISA fiduciaries.[13]

## V. RICO

Based upon the evidence the Court has considered so far, it doubts that plaintiffs have enough evidence to go to a jury on their RICO claims. Certainly the Court's conclusion that the Home Life contracts were not securities has diminished the number and variety of the alleged predicate acts, thus undercutting plaintiffs' pattern allegations. The Court also has reservations about plaintiffs' association-in-fact theory of the RICO enterprise. But these issues have not been adequately briefed for the Court to determine at this time. It thus anticipates additional pretrial motions on this aspect of the case.[14]

## VI. CONCLUSION

For the reasons stated above, the Court grants summary judgment in favor of all defendants with respect to the claims based upon the federal securities laws and ERISA. Judgment will be entered in favor of defendants and against plaintiffs on these claims (Counts I–III). The Court accordingly denies plaintiffs' cross-motion for summary judgment on these counts. The Court defers ruling on the summary judgment motions with respect to the RICO claims so that the parties can brief these issues more fully.

---

**13.** This resolution of the ERISA issue obviously moots the Kranke and Canapary defendants' request to bring counterclaims under ERISA against the Schwarzes for contribution.

**14.** The Levenfeld defendants have moved for partial summary judgment on the issue of damages under the malpractice claim. The Court believes this motion premature, and thus denies it without prejudice to its renewal following the Court's resolution of the RICO issue.